

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| JOHN FINLEY WALKER, | | No. 08-17-00133-CR |
| | § | |
| Appellant, | | Appeal from |
| | § | |
| v. | | 394th District Court |
| | § | |
| THE STATE OF TEXAS, | | of Brewster County, Texas |
| | § | |
| Appellee. | | (TC # 4397) |
| | § | |

**O P I N I O N**

Appellant John Finley Walker shot and killed his brother, Justin Walker. Of that fact, there was no dispute. Instead, the trial below turned on Appellant's claim of self-defense and defense of a third-person which the jury implicitly rejected through its guilty verdict. On appeal, Appellant contends his trial counsel provided constitutionally ineffective assistance, and he additionally complains of charge error based on the omission of a "necessity" instruction, and the inclusion of "provoking-the-difficulty" instruction. We, however, affirm.

**BACKGROUND**

Appellant and his brother, Justin Walker, lived with their mother Tammy Walker in a two-story residence in Alpine, Texas. Justin was twenty-one at the time of his death and Appellant was twenty. Theirs was not a peaceful household, ultimately culminating in Appellant shooting and killing Justin in the early morning of April 10, 2015. Appellant, Justin, and Tammy Walker

were all present at the time. Following two frantic 911 calls, several police officers arrived, all wearing body cameras that captured the scene. Justin was shot once in the stomach and was still alive when the police arrived. Bodycam footage shows the efforts of paramedics to save him at the scene. Bodycam footage also shows the scene at the hospital as Justin was unsuccessfully treated for his gunshot wound, and Appellant was treated for a four-inch gash on his right leg.

When one officer arrived at the scene, one of the first things Tammy said was "He stabbed him--out of protection--[Appellant] shot him." How this statement is punctuated, of course, drastically alters its meaning ("He stabbed him out of protection. Appellant shot him." OR "He stabbed him. Out of protection, Appellant shot him."). Tammy's conduct and other statements at the time of the event suggest the statement meant one thing, but her testimony at trial took the opposite construction.

Because self-defense was at issue, the trial court allowed in extensive evidence of the brother's past confrontations with each other, and third parties. We summarize that history before revisiting the events on the night of the murder.

### Prior Acts of Violence

In November of 2010, the brothers got into an argument when Tammy Walker, who was drunk, wanted to drive to the store. As they argued, she got in between them and Appellant, who was trying to strike Justin, ended up hitting Tammy. On seeing this, Justin started hitting Appellant in head. Their sister called the police who found Appellant "pretty beat up" and bleeding from the head and face. The police arrested Justin, but none of the participants would talk to the police about what happened. Appellant now claims that Justin had a gun during that incident.

Sometime in 2014, Tammy had several friends over who were all drinking on an outdoor patio. When Justin became annoyed at the noise, he came outside with a gun and threatened to

2

shoot someone in the group if they did not leave. Tammy took the gun away from him, and the participants provided somewhat conflicting versions of what happened next. One witness testified that as the group was leaving, Justin approached them with a bat and hit Tammy in the chest with his hand Another witness testified that as the group was leaving, she berated and slapped Justin for brandishing the weapon and he just stood there and took the abuse.

On another occasion, Justin's sister came home with her date, whom some in the family disapproved. Justin was sitting by back door with a gun and told the date that if he came in the house, he would shoot him. Appellant testified that he heard of this threat and took the gun away from Justin.

In June 2014, Appellant and his wife, Tara Gaugler, went to Balmorhea Park in Reeves County. After an afternoon of swimming and drinking, the couple got into a fight as they were leaving in Appellant's truck. When he began driving recklessly, she struck him, and he then hit her in the face, breaking open her lip. She testified that he twice threatened to kill her. Responding police officers arrested Appellant.

In August 2014, while at the house in Alpine, Appellant again became angry with Tara Gaugler. Tammy Walker tried to get in between the couple and Appellant picked Tammy up and threw her to the ground. He also hit Tammy four or five times. A neighbor called the police, resulting in Appellant's arrest. He was drinking at the time and acknowledged throughout the trial that he had a problem with alcohol.

In October 2014, the Alpine police department received a report of a reckless driver. The investigating officer found Appellant parked at Tara Gaugler's residence and arrested him for violating the terms of a protective order issued after the Balmorhea incident.

Sometime in late 2014, Appellant and Justin were out drinking and got into an argument.

3

Appellant got out of the truck that they were riding in and started walking home. Justin, however, executed a U-turn and hit Appellant with the truck. In a recorded statement, Appellant claimed that he then pulled Justin out of the truck and started to beat on him. At trial, however, Appellant recanted that statement. He claimed that after being hit, he then found Tammy at the American Legion and asked her to telephone Justin. She, however, wanted Appellant to report the incident to the police, and they then got into an argument, leading Appellant to knock out her back-car window with his elbow. An investigating officer ended up arresting Appellant for criminal mischief.

About a month and half before the shooting, both Appellant and Justin were living in adjacent motel rooms in Alpine. They got into an argument and as Appellant was trying to leave, Justin blocked the doorway. Appellant grabbed Justin by the throat and slammed him against the wall. Appellant felt a punch to his side and discovered the next day a hole in the sleeve and armpit area of his coat that he was told came from Justin's knife.

This background brings us to afternoon of April 9 and morning of April 10, 2015.

### April 10, 2015

At 12:30 a.m. the Alpine police department received the first of two 911 calls. The first caller's statement was largely unintelligible, provided no address, and made no direct mention of a stabbing or shooting. The 911 operator determined the approximate location of the call and dispatched units. Another operator received a second call at 12:32 a.m. This time, a male asked for assistance for a stab wound and provided a street address.

Officers Holguin, Bustamonte, and Carrillo arrived first. Tammy Walker came outside, distraught, saying "he just shot my son." Officer Bustamonte followed Tammy into the house, and she stated that "he stabbed him--out of protection--[Appellant] shot him." The officer then

4

encountered Appellant, who ran upstairs to where Justin was laying on the floor of a bedroom. Justin was shot once in the stomach. He expired at the hospital that morning and was never was able to give his version of events. Rather, Appellant and Tammy Walker were the only eyewitnesses, and what they saw was developed through police bodycam video from the scene, the hospital, and Appellant's recorded statement later that morning. Additionally, both Appellant and Tammy testified at trial, and she gave a brief handwritten statement. We recount both of their changing versions of what happened that night.

### Appellant's Versions of Events

Appellant was captured on bodycam footage upstairs as he first led the officers to Justin. He immediately admitted to shooting Justin but stated, "I didn't mean to hit him there" and "I didn't mean to do that." Appellant said, "he opened up my leg" and pointed to a four-inch gash on his right calf that went to the bone. He was taken into custody and held outside the residence while the officers and paramedics attended to Justin.

While being held outside, and awaiting an ambulance for his own wound, he gave the officers several disjointed statements about the events that evening. He stated that he went down the stairs, he heard Tammy screaming, and all he could think of was the gun. He again stated that he did not mean to shoot Justin where he did, and mentioned a bullet lodged in his own arm from some prior incident with Justin. He stated that "All I could think about what was he did to me and when I pulled the trigger it was in the wrong spot." Appellant admitted to consuming nine beers and two other bottled drinks that evening. He stated that he wanted to shoot Justin in the leg, but as Justin came down the stairs, the gun barrel was in his belly. He also stated that "I should have just left" but he heard his mother screaming. At the hospital he stated it "was his fault."

He then gave a statement at the police station that morning. In this statement, he claimed

5

that he was initially at the house by himself. He had been to Midland earlier in the day and bought an eight-ball of methamphetamine. He tried to smoke all the meth before anyone else got home, but Justin arrived in time to split the last ten percent. Justin then went upstairs to go to bed, and Appellant was downstairs working out and playing music. They had a disagreement about music volume but reached an accommodation. Tammy then got home and started yelling at Appellant over some trash at the back door. Justin started yelling down from the upstairs, and Appellant stated they "started calling each other out." Appellant went half-way up the stairs to a landing, and both brothers were yelling at each other. Appellant then went the rest of the way up the stairs and as he reached the top, Justin kicked him in the chest. Appellant then pushed Justin's head him through a window. He wrestled Justin down to the floor and put his foot on Justin's throat. Tammy then came up stairs and got between the brothers, and all three were on the ground.

Justin punched at Appellant and as Tammy pushed the two apart, Justin used a razor knife to cut first at Appellant's boot and then upward into his calf. Appellant had given Justin the razor knife that evening. Justin pushed him, and Appellant rolled down stairs. He claims that Justin had Tammy by the throat with the knife in his hand. Appellant then ran and grabbed a .22 rifle. He went back upstairs and as he got to the top of stairs, he figured that Justin had killed Tammy because it got quiet. Appellant already had the gun's hammer cocked when Justin came at him. The tip of barrel of the gun was in Justin's belly. Justin pushed him back and Appellant pulled the trigger intending to shoot Justin in the leg ("with full intention, I pulled the trigger"). Appellant then ran down the stairs and tried to call 911 on a land-line, when Tammy followed him down and ripped the cord from the phone. Tammy got another phone and made the second call to 911. Aside from the meth, Appellant admitted to drinking ten beers that evening and said that Justin had two beers.

6

At trial, his story was similar, but he added that he picked the .22 rifle because it had the least amount of powder in the load as he was only trying to stop Justin. As he was coming up the stairs, he saw Justin with one hand on the top part of the stair railing, and with the box-cutter in his other hand. He claimed to be a "couple of steps from top" of the stairs. As Justin was coming towards him, he pulled the trigger because Justin "wanted to kill me and I was scared. I didn't know what to do."[1]

Appellant also admitted to initially telling the police several lies at the scene. At trial, he testified that he never went to Midland that day, but had actually bought the meth from Justin, who was dealing the drug. They both equally split a "fifty" (or half a gram). The police found drug paraphernalia at the house consistent with methamphetamine use. Justin's cardiac blood, obtained at the autopsy, showed a low level of the metabolite of marijuana, but 870 nanograms per milliliter of methamphetamine. According the forensic pathologist's report, "Blood levels of 200 to 600 nanograms per milliliter have been reported in methamphetamine abusers who exhibited violent and irrational behavior" At trial, he claimed his earlier statements minimizing Justin's drug use were made to make Justin look better in the eyes of the authorities. Appellant also testified that Justin had about eight beers that evening, but the blood collected from the autopsy failed to confirm any alcohol. He also initially said that Justin's head went through and broke the upstairs window in their scuffle, but at trial, he said that Justin had actually pushed him through the window.

### Tammy Walker's Versions of Events

The bodycam videos also documented Tammy Walker's initial statements at the scene and hospital. As the officers first arrived, she tried to describe who stabbed who, and who shot who.

---

[1] The medical examiner, however, noted that the track of the bullet was left to right, front to back and *downward.* The prosecutor noted this discrepancy juxtaposed against the claim Appellant was coming up the stairs and shot his brother who was at the top of the stairs. When the gun was recovered, it also had one live shell in the chamber, meaning it had been cocked after it was first fired.

As they entered the house, she stated, "He stabbed him--out of protection--[Appellant] shot him." As they neared the staircase, she told Appellant to get out the way and that he "didn't f***ing care about [Justin]." While still at the house, she called a friend and told her that Justin "was trying to make peace and [Appellant] shot him; what's up with that"?

When at the hospital, she told one officer that she witnessed the shooting. She then explained that Appellant and Justin were fighting. Justin said you are not going to do this to me anymore. When Appellant said I will kill you, she ran up the stairs and saw Justin stab Appellant in the leg. She told Appellant to just to get out of the house, but he came back up the stairs with a .22 rifle. She tried to "get in the way and I told please don't do it, you can't do it and he just did it, there is no sense in anybody doing that." Justin pushed Tammy so she would not get hit. She told the officers that Appellant always gets crazy, and Justin always tried to keep him calm. While at the hospital, she never went into Appellant's room nor asked about the status of his injury.

Several weeks following the shooting, the Alpine police pressed Tammy for a written statement. She would not speak with them but provided a short-handwritten statement that summarily states the two brothers got into a fight, and she did not know how it started. When she went upstairs, she saw that Justin had pulled a knife and cut Appellant's leg. "Justin keep coming after him so I got between them trying to stop Justin but he wouldn't quit." The next thing she knew was that Appellant came up the stairs and shot Justin. Appellant told her he put a particular kind of round in the .22 that he thought would only stop, but not kill, Justin.

At trial, Tammy Walker's recounting of events was different. She testified that she got home around midnight. She got on Appellant about some trash at the back door and he stated that he would clean it up. Appellant was working out and playing some music loudly downstairs. Justin hollered down for him to turn the music down. The two brothers then started hollering back

8

and forth at each other. Appellant went upstairs and they got into a physical altercation. She went upstairs and got in the middle of them trying to stop the fight. In the midst of the wrestling, Justin got hold of a box-cutter type knife and cut Appellant's leg open. As she was trying to tend to that wound, she "told Justin to quit, but he said he didn't care." She tried to hold Justin back and told Appellant to leave because she couldn't get Justin to quit. Justin said at least three times that he was going to kill Appellant. She testified that she also feared for her own life because Justin would not stop and was hitting her in the stomach with the box knife. Appellant's counsel introduced into evidence a photo showing bruising and small cuts to her midsection.

Appellant had gone downstairs but came back up with a gun. Justin then threw her to the side and she heard the gun go off. When confronted with her various statements at the scene that Justin was just trying to make peace, she testified that she was not in her right mind at the time. When confronted with her statements at the hospital, she claimed it was unfair to have questioned her because she was focused on the efforts to save Justin. She also claimed that she had been drinking that night. She conceded, however, that Appellant has always been the stronger of the two brothers and he is usually the one that starts the fights.

### Jury Verdict and Sentence

The jury charged asked whether Appellant, with the intent to cause serious bodily injury, committed an act clearly dangerous to human life by shooting Justin Walker with a rifle. The charge instructed the jury on self-defense and defense of a third person as justifications for murder. It also charged the jury on "provoking the difficulty" which if proven beyond a reasonable doubt, forfeits any otherwise justifiable use of force. The trial court refused Appellant's request to include an instruction on the "necessity defense" found in TEX.PENAL CODE ANN. § 9.22.

The jury convicted Appellant of murder and the trial court sentenced him, consistent with

9

the jury's punishment verdict, to twenty-years' confinement. New counsel was appointed for this appeal who raises three issues: (1) ineffective assistance of counsel; (2) denial of a jury charge on the necessity defense; and (3) inclusion of provoking the difficulty instructions in the jury charge. We take those claims in order.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant contends that his trial counsel was ineffective because he failed to conduct a proper voir dire, failed to object to inflammatory material on several police bodycam videos, failed to object to statements in the prosecutor's closing argument, and failed to object to the charge.

### Standard of Review

Under the Sixth Amendment to the United States Constitution, a criminal defendant is entitled to be represented by effective, competent counsel. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). A criminal defendant, however, is not entitled to a flawless performance from counsel; "isolated lapses or mistakes during the trial are not necessarily indicative of ineffectiveness." *Calderon v. State*, 950 S.W.2d 121, 128 (Tex.App.--El Paso 1997, no pet.), *citing McFarland v. State*, 845 S.W.2d 824, 843 (Tex.Crim.App. 1992), *cert. denied*, 508 U.S. 963, 113 S.Ct. 2937, 124 L.Ed.2d 686 (1993). Rather, the defendant must show that counsel's performance was deficient to the extent that counsel failed to function as the "counsel" guaranteed by the Sixth Amendment. *Jackson v. State*, 877 S.W.2d 768, 771 (Tex.Crim.App. 1994).

To prevail on a claim of ineffective assistance of counsel, Appellant must establish by a preponderance of evidence that (1) his attorney's performance was deficient, and that (2) the attorney's deficient performance deprived him of a fair trial. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Ex parte Chandler*, 182 S.W.3d 350, 353 (Tex.Crim.App. 2005). Appellant must satisfy

10

both *Strickland* elements, and the failure to show either deficient performance or prejudice will defeat the claim. *Perez v. State*, 310 S.W.3d 890, 893 (Tex.Crim.App. 2010); *Rylander v. State*, 101 S.W.3d 107, 110-11 (Tex.Crim.App. 2003).

Under the first prong of the *Strickland* test, Appellant must show the attorney's performance fell below an objective standard of reasonableness. *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App. 1999). Stated otherwise, he must show the counsel's actions do not meet the objective norms for professional conduct of trial counsel. *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex.Crim.App. 2002). We presume, however, that the attorney's representation fell within the wide range of reasonable and professional assistance. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex.Crim.App. 2001), *citing Tong v. State*, 25 S.W.3d 707, 712 (Tex.Crim.App. 2000). Ineffective assistance claims must be firmly founded in the record to overcome this presumption. *Thompson*, 9 S.W.3d at 813. Consequently, a direct appeal is usually an inadequate vehicle for raising an ineffective assistance of counsel claim because the record is generally undeveloped as to why trial counsel did what he or she did. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex.Crim.App. 2005); *Thompson*, 9 S.W.3d at 814 n.6. When the record is silent as to trial counsel's strategy, we will not conclude that the Appellant received ineffective assistance unless the challenged conduct was "'so outrageous that no competent attorney would have engaged in it.'" *Goodspeed*, 187 S.W.3d at 392, *quoting Garcia v. State*, 57 S.W.3d 436, 440 (Tex.Crim.App. 2001); *see also Rylander*, 101 S.W.3d at 110-11 (noting that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective"). Stated otherwise, in the absence of direct evidence of counsel's reasons for the challenged conduct, an appellate court will assume a strategic motivation if any can be imagined. *Garcia v. State*, 57 S.W.3d 436, 441 (Tex.Crim.App. 2001).

11

Under the second *Strickland* prong, in a case that was actually tried, the defendant must establish that there is a reasonable probability that but for the attorney's deficient performance, the outcome of the case would have been different. *See Strickland*, 466 U.S. at 694, 104 S.Ct. at 2069; *Thompson*, 9 S.W.3d at 812.[2] A "reasonable probability" is that which is "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068; *Jackson v. State*, 973 S.W.2d 954, 956 (Tex.Crim.App. 1998).

With these standards in mind, we take up Appellant's complaints about his trial counsel.

### Voir Dire

Appellant first complains that trial counsel was deficient in voir dire. He specifically faults counsel for concluding his portion of the voir dire in only eleven pages of the record, in which counsel did not address punishment, drug use in a non-drug case, and witness credibility. He also faults trial counsel for not asking questions of one venireperson who stated that they had dated one of the witnesses.

Our record shows that the trial court initially gave general instructions explaining the trial process, possible bias, allocation of the burden of proof, reasonable doubt, the presumption of innocence, the right to remain silent, that the indictment is no indication of guilt, the possible range of punishment (including that jurors must be able to consider the full range), and prior media coverage or gossip about the case. The State's prosecutor addressed several additional topics, including whether anyone on the venire knew the prosecutor, Appellant, defense counsel, or several of the witnesses to the extent they would have issues hearing the case. The prosecutor also asked if anyone on the venire was previously the victim of a crime, had prior jury service, knew

---

[2] The prejudice rule is different when counsel's mistake causes the defendant to forego a legal proceeding, such as when a defendant pleads guilty based on erroneous advice. *See Lee v. U.S.*, 137 S. Ct. 1958, 1964-65 (2017).

the victim here, and could consider the full range of punishment. The prosecutor also discussed the legal issues attendant to voluntary intoxication and self-defense.

When it came his turn, Appellant's counsel followed up with several venirepersons who had responded to the prosecutor's questioning. Counsel also specifically asked several venirepersons who had connections to law enforcement if they could commit to rendering a not guilty verdict if the State failed to prove its case. Counsel further discussed the presumption of innocence, the burden of proof, he re-introduced the concept of self-defense, and discussed the use of deadly force to defend a third person. Finally, counsel also asked if the venire knew some additional named witnesses.

Following the attorneys' presentations, one venireperson was struck for cause by agreement. Appellant's counsel moved to strike four venirepersons for cause; one strike was agreed to, and the others required individual questioning, all performed by the trial court. Those challenges were denied, but are not addressed in this appeal.

On direct appeal, the lack of a complete record often precludes any valid consideration of the first *Strickland* factor. As the United States Supreme Court wrote:

> If the alleged error is one of commission, the record may reflect the action taken by counsel but not the reasons for it. The appellate court may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse. . . . The trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them.

*Massaro v. United States*, 123 S.Ct. 1690, 1694 (2003). This concern is equally true in alleged voir dire errors.

Contrary to Appellant's claim, the absolute length of a voir dire does not prove ineffective assistance unless the record also showed what prior knowledge trial counsel had about the venire (either through juror questionnaires, pre-voir dire investigation of prospective venirepersons, or as

13

in some smaller communities, just through common knowledge). As to the omission of specific topics, we must consider the entire voir dire, including the issues covered by the trial court and the prosecution. Competent counsel might exercise the sound trial strategy of deciding not to repeat subjects already addressed by the trial court and the State. *Goodspeed*, 187 S.W.3d at 392 (fact that the prosecution's questioning adequately covered the defense's concerns in voir dire could be a legitimate trial strategy under the appropriate circumstances). Here for instance, both the trial court and the prosecutor discussed the requirement to consider the entire range of punishment, and for that reason, defense counsel might have decided to spend his time elsewhere. Further, counsel might also forego a particular topic to avoid educating the State on how to exercise its pre-emptory strikes. *Id.* And while Appellant complains of the omission of questioning on drug use, we are unsure why the topic was omitted. Counsel might have concluded that since both the victim and Appellant were drug users, the issue would cut equally against the State. Appellant testified that the victim was a meth dealer, and any anti-drug bias might have cut more sharply against the State than Appellant. Without a developed record to understand the reasons counsel choose to focus only on the topics as he did, we are left to speculate about those reasons, which we decline to do.

Appellant also focuses on the lack of any detailed questioning of a venireperson who previously dated Appellant's wife (who testified for the State to prove up prior acts of violence). This venireperson is not identified in the record, and we cannot tell if they were in the likely strike zone. Nor do we know if defense counsel had some independent knowledge that would already indicate how that prior association would impact the venireperson's assessment of the witness.

Appellant's claims of ineffective assistance in voir dire fail to satisfy the first *Strickland* prong.

**Hearsay Testimony**

Next, Appellant faults his trial counsel for agreeing to the admissibility of the police officers' bodycam videos. Both sides agreed to admit bodycam evidence without requiring formal proof of foundation. The bodycam video evidence was extensive as five officers responded to the scene that evening and used the devices. Between the various recorders, the jury saw footage of the officers' initial entry into the house, the efforts to administer aide to Justin Walker, and the first statements from Tammy Walker and Appellant, both at the scene and the hospital. Appellant made several statements, some before he was *Mirandized*, and many afterwards. In total, the videos include twenty-one segments totaling over three hours of video.

Appellant's complaint on appeal--contained in a single paragraph of his brief--claims that trial counsel erred in agreeing to allow the video without proof of foundation and without redactions. Appellant offers no argument that a proper foundation could not have been laid to admit each of the bodycam segments. Requiring formal proof of a proper predicate that counsel knows to exist offers little benefit to a litigant.[3]

As to the substance captured by the video, the only specific complaint that Appellant raises is that it contains Appellant's own statements made before his *Miranda* rights were given, that it contains hearsay, and includes one specific reference that Appellant was wanted on an outstanding warrant from Reeves County. These cursory claims are unavailing. Appellant fails to identify any statement that he made before his *Miranda* rights were administered that he did not also make after he was informed of and waived those rights. Nor does Appellant identify any specific hearsay statement that caused him harm. Finally, the reference to the Reeves County warrant, even if

---

[3] Appellant insinuates some impropriety from the action of some officers who turned the cameras on and off. Those officers explained that the battery life of the units was limited, and they turned the units off to save the battery during lulls in the action.

15

erroneous, does not meet the *Strickland* prejudice standard. The references on the videos are brief and not explained. The jury later heard testimony about an assault by Appellant on his wife that took place in Reeves County, which is not challenged on appeal. Appellant testified that the warrant related to that incident in Reeves County.

No doubt, there were many redactions that could have been made to the lengthy bodycam footage, either based on relevance, duplication, or perceived prejudice. Sauce for the goose, however, is sauce for the gander. When one sides edits a tape, the other side might seek to edit out material they object to. The videos contain nuggets for both sides--both inculpatory and exculpatory. We do not discount the possibility that defense counsel might have chosen to allow all the videos in, even those that contain his own statements before *Miranda* rights were explained, to ensure the admission of helpful statements on the bodycam footage. Accordingly, we find neither that the decision to allow in all the videos proves ineffective assistance, nor that the single redaction that Appellant claims should have been made meets the prejudice standard.

### Closing Argument

Next, Appellant complains that his counsel failed to object to two misstatements from the prosecutor's closing argument. In the first statement, the prosecutor represented that the jury charge included the term "imminent danger" when that term does not appear in the charge. The misstatement, however, is found two sentences in the closing and is not otherwise woven into the prosecutor's argument. The prosecutor did argue that Appellant's use of force was not "immediately necessary" which is taken directly from the self-defense charge.[4] In so arguing the prosecutor once referred to the "imminent emergency of the situation." But the thrust of that

---

[4] "It is a defense to prosecution for Murder that the conduct in question is justified under our law. Under our law, a person is justified in using force against another when and to the degree that he reasonably believes the force is immediately necessary to protect himself against the other person's use or attempted use of unlawful force."

16

argument would likely be viewed as another way to argue the "immediately necessary" component of self-defense or defense of third persons. Even were the failure to object to this single sentence a lapse by counsel, it was not prejudicial in the *Strickland* sense.

The second statement pertain to the prosecutor's suggestion that Appellant cut his own leg to set up his self-defense claim. The gist of the prosecutor's argument was that Justin tried to cut Appellant out of self-defense when Appellant had his foot on Justin's throat, but the cut was if anything *de minimis*. But after Justin had already been shot, Appellant made the egregious cut to his calf to support the self-defense claim. The prosecutor advanced as proof of that theory the following facts: (1) the lack of any cut on Appellant's boots or ankle, even though he first claimed that is where he was injured; (2) Appellant's boots were found downstairs, and the prosecutor noted the absence of blood on the boot; (3) the relative lack of blood upstairs where the injury was reportedly made, in contrast to the greater amount of blood downstairs; (4) autopsy photos that showed a bruise to Justin's neck area; (5) a cut and blood in Appellant's jean pocket; (6) the fact that contrary to the police officer's order, Appellant ran upstairs when the police arrived and was out of sight for a short time; and (7) the box-cutter knife was found in a place it otherwise would not have been expected had Justin dropped it. From these facts, the prosecutor suggested that Appellant put the box-cutter in his own pants pocket after cutting himself, and that he ran upstairs to throw the knife near Justin when the police arrived.

Appellant's counsel did not object as the prosecutor argued this theory but responded to the self-injury argument as follows: "And, you know, I always do try to address the State's arguments, but I am not going to waste your time addressing that one too much. If you believe that, then I suggest you get on your unicorn or dragon and fly across to Narnia or middle earth or wherever in the universe." He also cajoled the State for not having tested any of the blood splatters

to identify them as either as coming from Justin or Appellant, which was one tenant of the State's self-injury claim.

Proper jury argument includes four areas: (1) summation of the evidence presented at trial, (2) reasonable deductions drawn from that evidence, (3) answers to the opposing counsel's argument, or (4) a plea for law enforcement. *Jackson v. State*, 17 S.W.3d 664, 673 (Tex.Crim.App. 2000), *citing McFarland v. State*, 845 S.W.2d 824, 844 (Tex.Crim.App. 1992). Appellant does not dispute any of the underlying facts that the prosecutor used to support the self-injury claim. At most, he contests whether self-injury can be reasonably deduced from those facts. We suppose that Appellant's counsel could have objected and challenged the reasonableness of the deductions. If sustained, counsel could then seek an instruction to disregard, and then a motion for mistrial. If the objection was overruled, counsel would have preserved an issue for appeal. But if overruled, a jury might view the ruling as an imprimatur of approval of the argument by the trial judge. Or, as counsel did, he could have ridiculed the prosecutor's claim and in effect contended the deduction was not a reasonable one. Each of these options fall into the realm of a strategic trial decision, and one that on this record we cannot fault.

## Charge Objections

Appellant's final claim of ineffective assistance focuses on the failure to object to the "provoking the difficulty" portion of the charge. As Appellant raises that issue separately in his third issue, we will address that portion of his ineffective assistance argument in that discussion.

## CHARGE ERROR

Appellant raises two issues arguing the trial court erred in the charge. In his second issue, Appellant contends that the trial court erred in omitting a charge on "necessity." In his third issue, he complains of the inclusion of a "provoking the difficulty" instruction in the charge.

18

## Standard of Review

The trial court shall deliver to the jury a "written charge distinctly setting forth the law applicable to the case." TEX.CODE CRIM.PROC.ANN. art. 36.14. Alleged jury charge error is reviewed in two steps: first, determine whether error exists; if so, evaluate whether sufficient harm resulted from the error to require reversal. *Price v. State*, 457 S.W.3d 437, 440 (Tex.Crim.App. 2015); *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.Crim.App. 2005). The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984)(op. on reh'g).

If the jury charge error has been properly preserved by an objection or request for instruction, reversal is required if the Appellant has suffered "some harm" from the error. *Vega v. State*, 394 S.W.3d 514, 519 (Tex.Crim.App. 2013); *Almanza,* 686 S.W.2d at 171; *see Barrios v. State*, 283 S.W.3d 348, 350 (Tex.Crim.App. 2009)("If there was error and appellant objected to the error at trial, reversal is required if the error is calculated to injure the rights of the defendant, which we have defined to mean that there is some harm.")(internal quotations marks omitted).

Charge error to which the defendant did not object is not harmful and does not require reversal unless the error is so egregious that the defendant is denied a fair and impartial trial. *Almanza*, 686 S.W.2d at 171. Jury charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex.Crim.App. 2016). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex.Crim.App. 2015), *quoting Reeves v. State,* 420 S.W.3d 812, 816 (Tex.Crim.App. 2013); *see Nava v. State,* 415 S.W.3d 289, 298 (Tex.Crim.App.

19

2013)("[Egregious harm] is a difficult standard to meet and requires a showing that the defendants were deprived of a fair and impartial trial.").

For either type of harm, we are tasked with considering the entire record, including (1) the entirety of the charge itself, (2) the evidence, (3) the arguments of counsel, and (4) other relevant information revealed by the record. *See Elizondo v. State*, 487 S.W.3d 185, 197 (Tex.Crim.App. 2016)(considering these factors for preserved charge error); *Sanchez v. State*, 209 S.W.3d 117, 121 (Tex.Crim.App. 2006)(considering same factors for egregious harm analysis).

### The Omitted Necessity Charge

The Texas Penal Code provides that an actor's conduct is justified if: "(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm; (2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and (3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear." TEX.PENAL CODE ANN. § 9.22. Appellant's second issues complains that the trial court failed to include this language in the charge. And indeed, a trial judge must give a requested instruction on every defensive issue raised by the evidence without regard to its source, its strength, or whether it is contradicted or credible. *Juarez v. State*, 308 S.W.3d 398, 404-05 (Tex.Crim.App. 2010). A defendant's only burden is to present that minimum quantity of evidence sufficient to support a rational jury finding each element of the defense. *Granger v. State*, 3 S.W.3d 36, 38 (Tex.Crim.App. 1999).

Several of our sister courts of appeals have concluded, albeit in unpublished opinions, that Section 9.22 ("the necessity defense") is unavailable in a murder prosecution when the defendant asserts deadly force was used in self-defense. *See Sneed v. State*, No. 11-15-00320-CR, 2017 WL

2588164, at *3 (Tex.App.--Eastland April 28, 2017, pet. ref'd)(mem. op., not designated for publication); *Kelley v. State*, No. 05-15-00545-CR, 2016 WL 1446147, at *7 (Tex.App.--Dallas Apr. 12, 2016, pet. ref'd) (mem. op., not designated for publication); *Wilson v. State*, No. 06-14-00021-CR, 2014 WL 8332264, at *4-5 (Tex.App.--Texarkana Nov. 7, 2014, pet. ref'd)(mem. op., not designated for publication). These cases reason that the legislature set out the requirements for deadly-force self-defense in TEX.PENAL CODE ANN. § 9.32(a). The more specific requirements of Section 9.32 evince a legislature purpose to exclude the necessity defense for such situations. Here, the trial court rejected Appellant's request for the necessity defense based on the "line of cases . . . finding that it is not an appropriate charge under the circumstances in this particular case." While we might agree with the rationale of our sister courts of appeals, a decision from the Texas Court of Criminal Appeals gives us pause.

The necessity defense came before the court in *Bowen v. State*, 162 S.W.3d 226 (Tex.Crim.App. 2005). Factually, the defendant in that case was arrested for disturbing the peace and public intoxication. *Id.* at 226-27. During the arrest, an officer claimed she resisted being handcuffed, and he took her to the ground to affect the restraint. *Id.* The officer claimed the defendant kicked the officer in the shin, which resulted in a separate charge for resisting arrest. *Id.* The defendant's story was far different, and she claimed the take-down injured her. *Id.* While on the ground she struggled to breathe, and when being lifted by only the only the handcuffs and her forearms, her arm popped out of its socket. *Id.* During this process, she admitted kicking the officer, but it was only to regain her balance. *Id.*

The trial court gave an instruction on self-defense but declined to submit an instruction on necessity. Appealing the conviction for resisting arrest, the intermediate court of appeals affirmed, reasoning that self-defense provisions in Section 9.31 of the Penal Code, which contains specific

language addressing resisting arrest, provide legislative support to exclude the availability of a necessity defense. *Id*. at 227. The Texas Court of Criminal Appeals, however, disagreed. It made several holdings germane to Appellant's claim here. First, the court looked to the plain language of Section 9.22 and concluded that it applies "in every case unless specifically excluded by the legislature." *Id.* at 229. Next, to determine whether a legislative purpose exists to exclude the defense, a court should focus on the statute defining the charged offense. *Id*. Nothing in the resisting arrest statute disallowed the necessity defense. *Id*. Applying that same logic here, nothing in the murder statute specifically addresses necessity as defense, much less specifically excludes it. As alleged here, Appellant intended to cause serious bodily injury and committed an act clearly dangerous to human life that caused the death of Justin Walker. Tex.Penal Code Ann. § 19.02(b)(2). Defenses to murder are therefore found in the other provisions of the Penal Code, which would include Section 9.22.

Second, the *Bowen* court specifically rejected the State's claim that the specific requirements for self-defense found Section 9.31 preclude the necessity defense, because the court concluded "that necessity and self-defense are separate defenses." *Id*. at 229-30 ("We have recognized the independence of separate defenses by holding that a defendant is entitled to the submission of every defensive issue raised by the evidence, even if the defense may be inconsistent with other defenses. We reaffirm this principle by holding self-defense's statutorily imposed restrictions do not foreclose necessity's availability.")(footnote omitted).

Our case involves the use of deadly force as found in Section 9.32 while *Bowen* only involved force as permitted in Section 9.31. The State's brief, however, points to no meaningful distinction based on the wording of the two statutes. Section 9.32 contains specific requirements allowing the justified use of deadly force such as the immediate necessity to "protect the actor

22

against the other's use or attempted use of unlawful deadly force" or to prevent the "imminent commission" of several specified crimes. TEX.PENAL CODE ANN. § 9.32. But Section 9.31 also has specific requirements applicable to the use of non-deadly force, and some that in *Bowen* specifically address the use of force when a peace officer affects an unlawful arrest. *Id.* at § 9.31(b)(2). While we may agree with the logic of our sister courts of appeals (none of which cite to or distinguish *Bowen*), or the cogent dissents from *Bowen* itself, were we pressed to do so, we might feel compelled to follow *Bowen* and conclude the failure to include the necessity charge was error.

But we still must decide if the error was harmful. And on that question, we rest our decision. Appellant's harm analysis is contained in a single two-sentence paragraph of his brief. His harm rationale is that the provocation instruction in the charge expressly negates self-defense, but that a necessity defense is not so encumbered. In support of this claim, he cites to the Waco Court of Appeals decision in *Ray v. State*, 419 S.W.3d 467, 469 (Tex.App.--Waco 2013, pet. ref'd) that found provocation is not a part of the necessity defense. *Id.* (though it goes on to hold the defendant in that case was not entitled to the defense because he never admitted to the underlying offense). Many of our sister courts of appeals, however, have taken the opposite view. *See, e.g.*, *Timmons v. State*, No. 13-15-00505-CR, 2017 WL 1549226, at *4 n.2 (Tex.App.--Corpus Christi Apr. 27, 2017, no pet.)(mem. op., not designated for publication); *Ford v. State*, 112 S.W.3d 788, 794 (Tex.App.--Houston [14th Dist.] 2003, no pet.); *Rangel v. State*, Nos. 04-01-00451-CR, 04-01-00452-CR, 04-01-00453-CR, 2002 WL 1625576, at *3-4 (Tex.App.--San Antonio July 24, 2002, no pet.)(not designated for publication); *Miller v. State*, 940 S.W.2d 810, 815 (Tex.App.--Fort Worth 1997, pet. ref'd); *McFarland v. State*, 784 S.W.2d 52, 54 (Tex.App.--Houston [1st

23

Dist.] 1990, no pet.); *Leach v. State*, 726 S.W.2d 598, 600 (Tex.App.--Houston [14th Dist.] 1987, no pet.)(so noting in dicta). Appellant does not address any of these cases.

And even were *Ray* correct, we conclude the practical import of an added necessity defense would not have resulted in some harm here. *See Alvarez v. State*, Nos. 02-16-00444-CR, 02-16-00445-CR, 2018 WL 651210, at *3 (Tex.App.--Fort Worth Feb. 1, 2018, no pet.)(not designated for publication)(declining to resolve this split in courts of appeals given that any error in refusing necessity charge would be harmless).

Under a harm analysis, we first consider the charge as a whole. *Elizondo*, 487 S.W.3d at 205. The charge already included instructions on self-defense and defense of third persons. We compare what the charge already contained, to what Appellant sought to add:

| Self-defense/third person defense | Necessity |
| --- | --- |
| 1. Appellant reasonably believed his action was immediately necessary to protect himself or Tammy from the use or attempted use of unlawful deadly force; and | 1. Appellant reasonably believed his action was immediately necessary to avoid an imminent harm; and |
| 2. under the circumstances as reasonably believed by Appellant, he would have been authorized to use the deadly force to defend himself or Tammy from the use or attempted use of unlawful deadly force he reasonably believed threatened himself or Tammy. | 2. the desirability and urgency of imminent harm clearly outweighed, according to ordinary standards of reasonableness, the harm sought to be prevented by the law prohibiting murder. |

The first element of the defense, at least on the facts of our case, are the functional equivalent of each other. Appellant argued that Justin had a knife and was either going to use it

24

on Appellant or his mother. He presented evidence that Justin threatened to kill Appellant, and that Justin jabbed his mother in the stomach with the knife as he hit her. However those actions are viewed, they are at least conduct that implicates either "imminent harm" or "use or threatened use of deadly force." As to the second element, the burden under the necessity charge is higher than that for self-defense or defense of a third person. Necessity requires that the urgency of the imminent harm "clearly outweighed" the societal justifications for prohibiting murder. Self-defense and defense of a third person requires only the actor's reasonable belief that deadly force was necessary to defend himself or a third person.

Next, we consider the evidence admitted at trial. *Elizondo*, 487 S.W.3d at 209. Without restating all the facts previously noted, we find no unique facts that would independently support a necessity defense. The trial raised several sharply contested factual issues including: Who was the aggressor? Was Justin trying to protect or injure Tammy? Why or even did Justin stab Appellant? Did Appellant retrieve the gun to protect himself or Tammy, or did he retrieve it to pay Justin back? In the context of this case, the facts do not steer one way under a self-defense charge and another way under the necessity defense. Nothing in the evidence thus shows harmful error.

Third, we consider the argument of counsel. *Elizondo*, 487 S.W.3d at 208. Appellant's counsel skillfully and carefully discussed the evidence to argue that what Tammy meant that night was that "[Justin] stabbed him. Out of protection, [Appellant] shot him." His closing was more about the facts and whether the jury would believe Appellant and Tammy's trial testimony, and less about the intricacies of the charge. The prosecutor emphasized that there was no immediate necessity to retrieve the gun and go back up the stairs. Her argument would be equally applicable if the issue was the "immediate necessity to avoid imminent harm" under a necessity charge. The

25

prosecutor in fact used those terms interchangeably. Nothing in the parities' arguments suggests Appellant's substantial rights were affected by the omission of a necessity charge.

Finally, we consider any other relevant evident or consideration. Several cases have analyzed this issue in the reverse--that is where the trial court gave a necessity instruction but not the self-defense charge and found any error to be harmless. *Barrios v. State*, 389 S.W.3d 382, 398 (Tex.App.--Texarkana 2012, pet. ref'd); *Flores v. State*, No. 13-08-00539-CR, 2009 WL 3136163, at *4 (Tex.App.--Corpus Christi Oct. 1, 2009, pet. ref'd)(mem. op., not designated for publication) (no harm in omitting self-defense charge in context of felon in possession charge); *Banks v. State,* 955 S.W.2d 116, 119 (Tex.App.--Fort Worth 1997, no pet.)(although trial court erred in failing to submit self-defense, no harm due to jury's rejection of defense of necessity).

We find nothing indicating that Appellant suffered any actual as distinct from a mere theoretical, harm, and we accordingly overrule Issue Two.

**The Included Provocation Charge**

Appellant's third issue challenges the inclusion of a provocation charge. Appellant's counsel did not object to the inclusion of this part of the charge, thus we could only reverse based on egregious error. However, a component of Appellant's ineffective assistance of counsel argument also contends that the failure to lodge an objection was a dereliction of counsel's duties.

Penal Code Section 9.32, which details when deadly force is permitted, first requires that the actor's conduct meets the basic self-defense requirements under Section 9.31. Similarly, a person is justified in using force, or deadly force to defend a third person if "the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force[.]" TEX.PENAL CODE ANN. § 9.33.

Under Section 9.31, the use of force against another is not justified:

(4) if the actor provoked the other's use or attempted use of unlawful force, unless:

(A) the actor abandons the encounter, or clearly communicates to the other his intent to do so reasonably believing he cannot safely abandon the encounter; and

(B) the other nevertheless continues or attempts to use unlawful force against the actor[.]

TEX.PENAL CODE ANN. § 9.31(b)(4). The charge in this case incorporated this provocation language. In its application section, the court instructed the jury that it could not consider self-defense or defense of a third person as a justification if the State proved provocation beyond a reasonable doubt.

While the statute simply uses the word "provoked," the case law applies a more robust texture to the word. Before a trial court may include a "provoking the difficulty" charge, it must be satisfied the record contains proof from which a rationale jury could conclude beyond a reasonable doubt the existence of these three elements:

(1) that the defendant did some act or used some words that provoked the attack on him,

(2) that such act or words were reasonably calculated to provoke the attack, and

(3) that the act was done or the words were used for the purpose and with the intent that the defendant would have a pretext for inflicting harm upon the other.

*Smith v. State*, 965 S.W.2d 509 (Tex.Crim.App. 1998). Here, Appellant concedes that the record contains evidence satisfying the first two elements. He contests only whether the evidence would support the third element--that the provocation was a pre-text for inflicting harm on Justin.

We agree that the record must show that Appellant intended his acts to have a provocative effect "as part of a larger plan of doing the victim harm." *Smith,* 965 S.W.2d at 518. This third element dates back to the turn of the last century when the Texas Court of Criminal Appeals required proof of "a certain craftiness and design [by the defendant that] . . . cause[d] his adversary to attack him, so that by appearance, at least, he shall be protected by law and the death have the

27

appearance of being in self-defense, when in truth it was in pursuance of a purpose either to kill or injure his enemy." *Gray v. State*, 114 S.W. 635, 645 (Tex.Crim.App. 1908). The third element necessarily is one of intent, most often proved by circumstantial evidence, and almost always for the fact finder to decide. *Smith*, 965 S.W.2d at 518, *citing Hernandez v. State*, 819 S.W.2d 806, 810 (Tex.Crim.App. 1991). There are, however, a relatively few "exceptional and extraordinary situations" when a record fails to support the submission of this third element. *Smith*, 965 S.W.2d at 519; *see also Elizondo*, 487 S.W.3d at 197 (no evidence of third element from bar fight that escalated into armed stand-off and then shooting); *Bennett v. State*, 726 S.W.2d 32, 36 (Tex.Crim.App. 1986)(insufficient evidence of provocation when it was inconceivable that the defendant contrived a set of events as a ploy to kill a man he did not even know).

We conclude, however, there was sufficient evidence on this record. First, there was certainly proof from prior dealings between these siblings that verbal disputes often erupted into more violent altercations, some involving the use of deadly weapons. One verbal argument first escalated to Justin hitting Appellant with a truck, which in turn lead Appellant to pull Justin out of the truck and beat him. Only a short time before the shooting, a verbal argument lead to Appellant pinning Justin by the throat up against a wall, which in turn caused Justin to attempt to stab Appellant. At the scene, Appellant claimed he had a bullet in his arm that Justin had put there. He specifically stated he planned to shoot Justin in the knee-cap with a specific .22 load that he thought would only incapacitate, but not kill him. The record was not lacking for motive, nor an understanding of how a simple argument could turn into something more.

Second, Appellant allowed the verbal fight that evening to escalate to a physical fight. He was on the landing of the stairs, and Justin at the top of the stairs as they threw barbs at each other. Appellant then went up the stairs to face Justin, and quickly pushed Justin through a window, then

28

had him down on the ground with his foot on his throat. Third, Appellant gave the box-cutter knife to Justin that very evening. And the State placed great emphasis on where the knife was found later that night. Appellant claims that he shot Justin while coming up the stairs, as Justin was coming towards him. The knife, however, was found on the opposite side of the room intermingled in some clothing on the floor. When the police arrived, Appellant ran up the stairs, contrary to an officer's instructions. For a brief time, he was out of sight. The prosecutor pointed to a cut in Appellant's pants pocket, along with some blood found there, to support the interference that Appellant had the box-cutter in his pocket at that time, and that he planted the knife back in the room.

And perhaps most important to us is the evidence of drug use. Appellant testified either that he smoked the same amount, or perhaps nine-times as much, methamphetamine as did Justin. The level of meth in Justin's blood stream was above the level that causes "violent and *irrational* behavior." [Emphasis added]. While it might appear at odds with any sense of normal human behavior for one brother to set up another for serious injury or harm, Appellant's drug use places him on a different plane of rationality. The jury could have viewed his actions not through the prism of normal rationality, but rather through a drug-fueled irrationality.

As we conclude that it was not error to give the charge, we need not address whether any error was egregious, given the lack of any objection.[5] By the same token, because submission of the charge was not error, counsel did not provide ineffective assistance in failing to lodge an objection to the charge. *See Ex parte Morrow,* 952 S.W.2d 530, 536 (Tex.Crim.App. 1997)

---

[5] We do note that the Prosecutor's comments on the "provoking the difficulty" portion of the charge covers less than a page of her thirty-page closing, and most of that segment was devoted to reading the application portion of the charge.

(counsel is not required to object if an objection would be futile). We therefore overrule Issue Three, and the balance of Issue One.

## CONCLUSION

We overrule Issues One, Two, and Three and affirm the conviction below.

August 7, 2019
                              ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)